**E-FILED**
Wednesday, 08 March, 2006  02:08:25 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| NICOLE ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  05-3012 |
| | ) | |
| CINGULAR WIRELESS, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Cingular Wireless's Motion to Strike Plaintiff Nicole Alexander's Response to Defendant's Statement of Undisputed Material Facts (d/e 28), Motion to Strike Portions of the Affidavit of Sabrina Orr (d/e 29), and Motion for Summary Judgment (d/e 25).  Plaintiff Nicole Alexander brings this action against Defendant Cingular Wireless (Cingular) alleging retaliation under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq*.  Cingular moves to strike, in whole or in part, Plaintiff Alexander's Response to Defendant's Statement of Undisputed Material Facts for failure to comply with Central District of Illinois Local Rule 7.1(D)(2).  Cingular also moves

to strike paragraphs 4, 5, 6, 9, 10,13 and 15 of the Affidavit of Sabrina Orr.
See Plaintiff's Response to Defendant's Motion for Summary Judgment (d/e 26), Exhibit B, Affidavit of Sabrina Orr (Orr Affidavit).  Cingular further moves for summary judgment.  For the reasons set forth below, Defendant's Motion to Strike Plaintiff's Response to Defendant's Undisputed Material Facts is DENIED; Defendant's Motion to Strike Portions of the Affidavit of Sabrina Orr is ALLOWED, in part, and DENIED, in part; and Defendant's Motion for Summary Judgment is ALLOWED.

ANALYSIS

A.   DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant moves to strike 22 separate paragraphs of Alexander's disputed material facts, as set forth in her Response to Defendant's Motion for Summary Judgment, based on the fact that the paragraphs fail to comply with the Central District of Illinois Local Rules.  Cingular complains that, in disputing the portions of Defendant's Statement of Undisputed Material Facts contained in Defendant's Motion for Summary Judgment, Plaintiff includes additional facts that should have been set forth in her statement of additional facts, as required under the Local Rule.  Defendant complains

that this defect prevents Defendant from properly responding to these additional facts because Local Rule 7.1(D)(3) requires Plaintiff to reply only to Plaintiff's statement of Additional Material Facts.  Defendant further complains that many of the statements in Plaintiff's Response to Defendant's Statement of Undisputed Material Facts do not constitute specific denials of the facts set forth by Defendant, and are argumentative and evasive.

Local Rule 7.1(D) provides that "[a]ny filings not in compliance may be stricken by the court."  The Seventh Circuit, in <u>Waldridge v. American Hoechst Corp.</u>, held that the district courts have discretion to determine whether the Local Rules governing summary judgment motions should be applied strictly.  <u>Waldridge</u>, 24 F.3d 918, 923 (7th Cir. 1994).  Under Local Rule 7.1(D)(2)(b)(2), a party responding to a motion for summary judgment must: "List by number each fact from Section B of the motion for summary judgment which is claimed to be disputed.  Each such claim of disputed fact shall be supported by evidentiary documentation referenced by specific page."  Local Rule 7.1(D)(2)(b)(2).  Plaintiff responds that she complied with the requirements of Local Rule 7.1(D)(2)(b)(2).  The Court agrees.  Plaintiff complied with the requirements of this rule by listing each

fact that she believed was in dispute and by supporting such claim of disputed fact by providing evidentiary documentation with appropriate citations.  The Court further finds that the plain reading of Local Rule 7.1(D)(2)(b)(4) does not require Plaintiff to list those facts which she cites as evidence of the existence of disputed material facts as "additional material facts."  This rule states that, in responding to a motion for summary judgment, a party must "[l]ist and number each additional material fact raised in opposition to the motion for summary judgment."  Local Rule 7.1(D)(2)(b)(4).  Thus, this rule requires the party to list "additional material fact" not listed elsewhere in the non-moving party's response.  Accordingly, Plaintiff complied with the requirements of the Local Rules in her response to Defendant's summary judgment motion.  The Court further finds that Plaintiff's Response to Defendant's Statement of Undisputed Material Facts contains specific denials.  The Motion to Strike is denied.

B.      DEFENDANT'S MOTION TO STRIKE PORTIONS OF THE AFFIDAVIT OF SABRINA ORR

Defendant moves to strike ¶¶ 4, 5, 6, 9, 10, 13, and 15 of Orr's Affidavit pursuant to Federal Rule of Civil Procedure 56(e) which requires

that an affidavit be based on personal knowledge of the affiant, set forth facts admissible in evidence, and show that the affiant is competent to testify to the matters stated in the affidavit.  Fed. R. Civ. P. 56(e).

First, Defendant argues that statements contained in ¶¶ 4, 5, and 6 should be stricken because they fail to set forth sufficient basis for affiant's knowledge and thus are merely speculation.  Paragraphs 4, 5, and 6 state as follows:

> 4.  While assigned to the Paperwork Department, I regularly witnessed, on an almost daily basis, Cingular Wireless employees assigned to the Paperwork Department eat meals purchased from restaurants such as McDonald's or plates of food purchased from the cafeteria located within the Springfield Call Center at their work stations or in the "break room" while logged into the Cingular Wireless phone system and "on the clock."  These employees included, but were not limited to, Travis Lipe, Tember Day, Nancy Moomy, Samantha Stout, Steve McMillan, (first name unknown) Lehman, Michelle (last name unknown) and Amy Burlison.  I witnessed Cingular Wireless management personnel Jim Graham, Reba Roberts and Amy Burlison observe Paperwork Department employees eat meals at their work stations.

> 5.  While assigned to the Paperwork Department, I regularly witnessed Cingular Wireless employees assigned to the Paperwork Department leave their workstations to go down to the cafeteria to purchase food while logged into the Cingular Wireless phone system and "on the clock."  Amy Burlison would often accompany Paperwork Department employees as they left workstations to go down to the cafeteria to purchase food while logged into the Cingular Wireless phone system and "on the

clock."

> 6.  While assigned to the Paperwork Department, I regularly witnessed Cingular Wireless employees assigned to the Paperwork Department leave their workstations five or six times per day to take smoke breaks while logged into the Cingular Wireless phone system and "on the clock."  These employees included, but were not limited to, Tim (last name unknown), Stephanie (last name unknown) Nancy Moomy, and Amy Burlison.

Orr Affidavit, ¶¶ 4-6.  Plaintiff argues that Orr has sufficiently provided the factual support for the assertions in ¶¶ 4, 5, and 6 because Orr has personally witnessed the acts described in these paragraphs.  The Court, however, strikes ¶¶ 4, 5 and 6 because Orr fails to set forth a sufficient basis of her knowledge.  Even though Orr could have personally witnessed these employees (including, Travis Lipe, Tember Day, Nancy Moomy, Stephan McMillan) eating meals at their work stations, going to the cafeteria, or taking breaks, she fails to sufficiently set forth the factual basis of how she knew these employees were "logged" into the phone system and "on the clock" while engaging in the aforementioned activities.[1]

Second, Defendant contends that ¶ 9 should be stricken because it

---

[1] The Court notes that the above individuals have submitted Affidavits attesting to the contrary.  See Defendant's Motion for Summary Judgment, Exhibit H, Affidavit of Tember Day; Exhibit I, Affidavit of Nancy Moomy; Exhibit J, Affidavit of Travis Lipe; Exhibit K, Affidavit of Stephen McMillan.

contains statements that are merely speculation.   In ¶ 9, Orr states as follows:

> 9.   While I was assigned to the Paperwork Department, I observed Amy Burlison treat Nicole Alexander more harshly than she treated other employees assigned to the Paperwork Department.  This disparity in treatment included Amy Burlison "writing up" Nicole Alexander for errors when other employees would simply receive verbal instructions to correct similar errors that they had made.

Orr Affidavit, ¶ 9.  The statements contained in ¶ 9 are within a recognized hearsay exception, specifically Federal Rule of Evidence 801(d)(2)(D), and thus need not be stricken.  Rule 801(d)(2)(D) states that a statement is not hearsay if it is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D).  Orr has personal knowledge of the facts stated in ¶ 9 concerning Burlison's "writing up" of Plaintiff because she witnessed the above event.  Further, Amy Burlison is a manager of the Paperwork Department at Cingular.  Any statement or conduct attributed to Amy Burlison concerning the scope of her employment with Cingular is non-hearsay.

Third, Defendant argues that ¶ 10 should be stricken because it contains a statement that fails to set forth sufficient basis of affiant's

knowledge.  Specifically, Defendant contends that the following statement in ¶ 10 should be stricken: "While in the break room finishing our lunches, Nicole and I were unaware that we were violating any Cingular Wireless policy by finishing our lunches in the break room as we were simply doing as we had been instructed to do by Lisa Holt."  Orr Affidavit, ¶ 10. Moreover, Defendant contends that the above statement contradicts Plaintiff Alexander's deposition testimony.   In her deposition, Plaintiff testified:

> Q.    Were you aware that you couldn't engage in personal business while on the clock, you were well aware of that?
>
> A.    Okay.  See, I was aware of that.  However, in my department, that was never enforced.
>
> Q.    Okay.  But you were aware that was Cingular's policy that you could not do that?
>
> A.    Yes, I was aware that was a policy of the company, yes, I was.

Defendant's Motion for Summary Judgment, Exhibit A, Deposition of Nicole Alexander (Alexander Dep.) at 146.  The above statement is stricken because it not only fails to provide sufficient factual support of Orr's knowledge regarding whether Plaintiff knew she was violating Cingular's policies, but also because the statement contradicts Plaintiff Alexander's

deposition testimony.

Fourth, Defendant argues that ¶¶ 13 and 15 should be stricken because each contains hearsay statements. Paragraphs 13 and 15 provide statements attributed to Travis Lipe. Plaintiff argues that the assertions contained in these paragraphs are within a recognized hearsay exception, specifically Rule 801(d)(2)(D). The Court disagrees. The statements attributed to Lipe in these paragraphs were not made by Cingular's agent during the scope of his employment with Cingular; they were allegedly made during non-working hours. Thus, the statements contained in the aforementioned paragraphs are hearsay and not within any recognized hearsay exception. The Court strikes ¶¶ 13 and 15.

C.    <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant Cingular Wireless is a Delaware corporation doing business at 5020 Ash Grove, Springfield, Sangamon County, Illinois. Plaintiff Nicole Alexander began working for Cingular on September 5, 2000, as a customer service representative. <u>Alexander Dep.</u> at 37. When Alexander began her employment with Cingular, she received a copy of Cingular's Code of Business Conduct. <u>Id.</u> at 54. Alexander signed a Code of Business Conduct Review Acknowledgment form dated September 5,

2000, affirming that she had read and understood Cingular's Code of Business Conduct.   <u>Defendant's Motion for Summary Judgment,</u> Attachments to Exhibit A, Exhibit 2, <u>Code of Business Conduct Review Acknowledgment Form</u>.  Cingular's Code of Business Conduct provides in relevant part: "Company business records must always be prepared accurately and reliably.  All reports, email, vouchers, bills, time records, payroll and service records, measurement and performance records and other essential data must be prepared with care and honesty."  <u>Defendant's Motion for Summary Judgment,</u> Attachments to Exhibit A, Exhibit 8, <u>Cingular's Code of Business Conduct</u> at 14.  It further provides that employees will be liable for engaging in corrupt or fraudulent business practices when they make any statement, or "engage in any act or omission that creates a misrepresentation or fraud in any transaction."  <u>Id.</u> at 28. According to the code, "[a]ny failure on the part of an employee to meet the standards embodied in this Code can lead to disciplinary action, up to and including dismissal."  <u>Id.</u> at 5.

Alexander was diagnosed with migraine headaches as a child.  In June 2001, Dr. Dennis McManus again diagnosed her with migraine headaches. Due to her medical condition, Alexander applied for leave under FMLA at

various times during her employment with Cingular. In 2003, Alexander requested approximately 27 days of intermittent FMLA leave; Cingular granted all her requests. See Alexander Dep. at 64-65. Sometime in early 2004, Alexander began working as a clerk in the Paperwork Department at Cingular's Springfield Call Center. At the Paperwork Department, Alexander reported to Amy Burlison, Customer Service Manager. Burlison testified in her deposition that she began supervising Alexander in June of 2003. Defendant's Motion for Summary Judgment, Exhibit D, Deposition of Amy Burlison (Burlison Dep.) at 11. According to Alexander, when she requested leave under FMLA, Burlison responded in a "negative fashion" regarding her use of FMLA leave; Alexander testified that Burlison acted as if it was an inconvenience. Alexander Dep. at 41. Alexander further testified as follows: "As I indicated, [Burlison] said can't you take some aspirin and stay. That would be about the only comments that she would say." Id. at 47. During the first seven months of 2004, Alexander took approximately 10 days of FMLA leave. Id. at 65.

As a manager at the Paperwork Department, Burlison's duties included keeping track of employees' timekeeping, auditing their work, making sure they were meeting performance standards, and administering

discipline when necessary.  <u>Burlison Dep.</u> at 11.  Burlison reported to Nancy Wells, Senior Area Manager, Springfield Call Center Director.  <u>Id.</u> at 15. When Wells was not available, Burlison reported to Lisa Holt, Senior Area Manger at Cingular's Springfield Call Center, or Jim Graham, Senior Area Manager at Cingular's Springfield Call Center.  <u>Id.</u> at 16.

In either late December of 2003 or early January of 2004, Cingular's facilities manager Kay Robinson sent out an email dated December 31, 2003, informing Cingular's employees of a new food policy that would be effective starting January 1, 2004.   <u>Plaintiff's Response to Defendant's Motion for Summary Judgment</u>, Exhibit A, <u>Robinson's email.</u>  The email provided in relevant part: "No meals on the open floor -- All meals need to be eaten in the cafeteria or in the break rooms . . . . Also, all drinks need to have lids on them, if they are being taken out of these areas."  <u>Id.</u>  Under this new food policy, food such as sandwiches and hot foods, including spaghetti, were considered meals, not snacks.  <u>Burlison Dep.</u> at 48-9; <u>Alexander Dep.</u> at 113-114.

According to Holt, an employee was allowed to bring a covered or closed meal and place it on the desk.  However, Holt indicated that if she observed an employee bringing leftover lunch that was not covered or in a

closed container, she would direct the employee either to cover the food or to move it to the break room. <u>Defendant's Motion for Summary Judgment</u>, Exhibit G, <u>Deposition of Lisa Holt (Holt Dep.)</u> at 18.

On April 16, 2004, Paperwork Department employees, including Alexander, attended The Look Before You Leap training program, which was Cingluar's code of business conduct training. Even though Alexander could not remember the details of the training program, she testified that she was told during the meeting that employees needed to be logged into the phone system when working and logged off when not working. <u>Alexander Dep</u>. at 130. Failure to do so would be a code of business conduct violation. <u>Id.</u> This is because the employees' hours worked were used in calculating their pay and in serving as a time clock. <u>Defendant's Motion for Summary Judgment</u> at 1.

On July 1, 2004, Alexander attended another coaching session. Alexander testified that, at this session, Burlison advised "that it would be. . .a code of conduct violation to be logged into the computer and not on the phone, not logged on to the phone." <u>Alexander Dep.</u> at 32. Burlison also advised the Paperwork Department employees that when they came back early from their lunches, they should not be logged in. <u>Id.</u> at 33.

Alexander attended another coaching session on July 13, 2004. At this meeting, Burlison reiterated the need to be logged into the phone system when working and logged off when not working. Burlison advised the employees that "[b]ecause the phone system is used for timekeeping and hence, payroll, it is the company's expectations that if an employee is away from his or her desk for an extended period, he or she must be logged out." Defendant's Motion for Summary Judgment at 9; Burlison Dep. at 43-44.

On July 19, 2004, Alexander and Sabrina Orr, another clerk at the Paperwork Department, went to the cafeteria to get lunch.[2]  Before purchasing their food, Alexander and Orr went outside to have a cigarette for approximately five or ten minutes. Alexander Dep. at 142. Thereafter, Alexander purchased spaghetti with meatballs and garlic bread. Id. Alexander and Orr did not eat all of their lunches. After their lunch break was over, Alexander and Orr decided to bring their leftovers with them back to their workstations and to finish them later. As Alexander and Orr were walking up the stairs, they met Holt who observed them with a plate of food

---

[2]Orr began working for Cingular in January 2001. Orr Affidavit, ¶ 1. On January 21, 2001, Orr requested to take leave under FMLA. "Her request for leave was approved and expired on July 30, 2002." Defendant's Motion for Summary Judgment, Exhibit G, Declaration of Bob Rasmussen (Rasmussen Decl.), ¶ 10. Since that time, Orr has never requested to take FMLA leave. Alexander Dep. at 161-162. In October 2003, she was transferred to the Paperwork Department and began working as a clerk.

in their hands.  Alexander went to her desk and placed the spaghetti down on her desk.  She then logged into the phone system.  When Holt observed Alexander and Orr putting the spaghetti on their desks, she told them that they could not have food on their desks and instructed them to put the food in the break room.  Holt then walked to the desk of Customer Service Manager Reba Roberts, who was on the phone at that time.

Alexander and Orr proceeded to the break room with their food and finished their lunches.  Before going to the break room, Alexander did not log out of the system.  She did not ask Burlison for permission to finish her lunch in the break room.  She admitted in her deposition that she logged into the phone system and was "on the clock" when she was in the break room finishing her lunch.  Alexander Dep. at 153.  Alexander testified that the "no eating policy" at the workstation was never enforced in the Paperwork Department; it was only enforced with customer service representatives.  Id. at 156.

As soon as Roberts got off the phone, Holt told Roberts about the incident and told her that Alexander might have gone to the break room without logging out of her phone system.  Holt Dep. at 32.  A few minutes later, Roberts told Burlison that Holt might have witnessed Alexander and

Orr logging into the phone system and then leaving their workstations with food.   <u>Burlison Dep</u>. at 55.   Burlison then accessed the timekeeping/telephone system to determine at what time Alexander and Orr had logged back into the system after their lunch break was over.  <u>Id.</u> at 58.  When Alexander and Orr returned to their desks, Roberts and Burlison were still at Burlison's computer reviewing the timekeeping system.

According to Burlison, Alexander and Orr were away from their workstations for approximately 18 minutes after they logged back into the system following their initial lunch break.  <u>Id.</u>  Alexander disputes this; she testified that she was in the break room for only 10 to 12 minutes.  <u>Alexander Dep.</u> at 147.  Alexander also submits Orr's Affidavit in which Orr states that she and Alexander were in the break room for approximately seven and a half minutes.  <u>Orr's Affidavit</u>, ¶ 10.

When Alexander and Orr returned from the break room, Burlison sought guidance from Cingular's Human Resources Department.  <u>Burlison Dep</u>. at 59.  According to Burlison, Alexander and Orr's conduct of going to the break room without logging out of the phone system constituted a violation of the code of business conduct because they attempted to defraud the timekeeping system.  <u>Id.</u>  Burlison also testified that an employee could

be terminated if he or she violated Cingular's code of business conduct.  Id.
at 60.  Burlison stated that she had no discretion regarding reporting the
incident to the Human Resources Department because the matter was
referred to her by a senior area manager and because she believed the
incident involved a possible violation of the code of business conduct.  Id.
at 87-88.  Burlison informed the Human Resources Department that
Alexander and Orr had logged into the phone system after returning from
lunch, but then went to the break room for approximately 20 minutes
without logging out.  Rasmussen Decl., ¶ 3.

Burlison and Roberts subsequently met with Alexander and Orr on
that day to discuss the incident.  Burlison Dep. at 59-60.  During the
meeting, Burlison asked Alexander why she did not just come talk to her
about taking an additional lunch break.  Alexander Dep. at 179.  Alexander
responded that she did not think it was a big deal.  Id. at 178.  Burlison also
discussed the code of business conduct with Alexander and told her that she
needed to be working when she was logged into the phone system.
According to Alexander, at the meeting, Burlison "went from discussing . .
. having food at [her] desk to all the sudden saying something about I've
talked to you before about the FMLA."  Alexander Dep. at 36.

17

Beginning July 22, 2004, based on the information Burlison had provided regarding the July 19, 2004, incident Bob Rasmussen, Human Resources Manger, and John O'Connor, Senior Human Resources Manager, conducted their independent investigation of the incident.  When they interviewed Alexander, she admitted that she finished her lunch while logged into the phone system because she had been told to do so by Holt. Rasmussen Decl., ¶ 4.  During the interview, O'Connor told Alexander that her conduct constituted falsification of company records.  Id.

At the conclusion of the investigation, Rasmussen and O'Connor determined that Holt had only told Alexander and Orr that they could not have their food at the workstation.  They further determined that Alexander and Orr's conduct constituted a code of business conduct violation. Rasmussen Decl., ¶ 5.  Thereafter, Rasmussen and O'Connor consulted with Holt about their decision to recommend Alexander and Orr's termination. Holt concurred in the decision to recommend Alexander and Orr's termination for violating Cingular's code of business conduct.   Holt instructed Burlison to draft separation proposals for Alexander and Orr.

At Cingular, once a decision is made to terminate an employee, it is a common practice for an employee's direct supervisor to prepare the

separation proposal even if the supervisor was not directly involved in the incident or the decision.  <u>Defendant's Motion for Summary Judgment</u>, Exhibit B, <u>Declaration of Lisa Holt (Holt Decl.)</u>, ¶ 2; <u>Burlison Dep</u>. at 85-86.  In order to prepare the separation proposal, Burlison relied on the information contained in Alexander's interaction log, which documented meetings, coachings, and interactions with Alexander.   According to Alexander, her interaction log was readily accessible for anyone's review. When asked about the accuracy of the information contained in her interaction log at her deposition, Alexander testified as follows:

> A.      Uhm, just some of the things, and I guess that when you put an entry in, you have to put what type of, whether it was a coaching, counseling or something like that.  But some of the things that are put in there as a coaching, I don't consider standing up and yelling at me from your desk a coaching session. Some of those I can recall that were marked in there as coaching.  I was just under the assumption coaching was when you sat down with the employee one on one and discussed the issue.

> Q.      Other than that, nothing else stuck out as being inaccurate?

> A.      Nothing too major.

<u>Alexander Dep</u>. at 125-6.  Burlison submitted the separation proposals for Holt's review.  <u>Defendant's Motion for Summary Judgment</u>, Exhibit 6,

Separation Proposal dated July 26, 2004.   After Holt reviewed the separation proposals, she forwarded them to Rasmussen, O'Connor, Jim Klimas, Director of Human Resources, Maureen Sutton, Counsel-Labor and Human Resources, Wells, and Grace Seymore, Regional Vice President.  All individuals who received the separation proposals concurred in the decision to terminate Alexander and Orr.  Rasmussen Decl., ¶ 6.

Holt testified that Burlison was not involved in the decision to terminate Alexander or Orr.  Similarly, Rasmussen states that Burlison neither was involved in the decision to terminate Alexander and Orr nor recommended that they be terminated.  Id. at ¶ 8.  Rasmussen further states that "[a]t no point during the investigation of Ms. Alexander's conduct on July 19, 2004, or during the process which led to her and Ms. Orr's termination was Ms. Alexander's purported use of FMLA leave discussed, mentioned, or considered by me."  Rasmussen Decl. at ¶ 7.

According to Alexander, at her suspension meeting held July 25, 2004, O'Connor discussed Alexander's having food at her desk.  She also admitted at her deposition that O'Connor told her that, because she had taken an unapproved second lunch break for approximately 20 minutes, her conduct was considered stealing and falsifying company records.  Alexander

<u>Dep.</u> at 102-103, 108.  On July 26, 2004, Alexander was suspended for the July 19, 2004, incident.   On August 2, 2004, Alexander and Orr were terminated for the July 19, 2004, incident, which constituted a violation of Cingular's code of business conduct.  However, Alexander alleges that she was not told that she was being terminated for violating Cingular's code of business conduct at her termination meeting; she testified that Graham told her that she was being terminated for her attempt to eat food at her desk. <u>Alexander Dep</u>. at 107.[3]

Alexander complains that Defendant fired her in retaliation for her use of FMLA leave.  She contends that Cingular's stated reason for her discharge is a pretext.  She further contends that "[t]he temporal sequence of Plaintiff's use of FMLA leave and her subsequent discharge," in addition to Burlison's negative comments regarding Plaintiff's use of FMLA leave, "suggest that there is a causal connection between Plaintiff's use of FMLA leave and Plaintiff's discharge." <u>Complaint</u>, ¶ 15.

Cingular argues that Alexander admittedly violated company policy and was fired for doing so.  It also argues that there is no evidence of an

---

[3]Orr also states in her Affidavit that Graham told her during her termination meeting held August 2, 2004, that she was being discharged for eating food at her work station.  <u>Orr Affidavit</u>, ¶ 14.

employee who is similarly situated to Plaintiff, and who did not take FMLA leave receiving more favorable treatment than Plaintiff.  It also notes that it granted each FMLA leave request by Plaintiff and that the person who recommended Plaintiff's termination had no knowledge Plaintiff had taken FMLA leave.

## ANALYSIS

Cingular moves for summary judgment.  At summary judgment, Cingular must present evidence that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to Alexander.  Any doubt as to the existence of a genuine issue for trial must be resolved against Cingular.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once Cingular has met its burden, Alexander must present evidence to show that issues of fact remain with respect to an issue essential to her case, and on which she will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  When viewed in the light most favorable to Alexander, Cingular is entitled to summary judgment.

Alexander alleges a retaliation claim under FMLA.  FMLA "provides eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition as defined by the Act."  King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999) (citing 29 U.S.C. § 2612(a)(1)).  FMLA prohibits employees from discharging or discriminating against an employee "for taking part in proceedings or inquiries under FMLA."  Kauffman v. Federal Express Corp., 426 F.3d 880, 884 (7th Cir. 2005) (citing 29 U.S.C. § 2615(b)).  This provision is construed as creating a cause of action for retaliation.  Id.  When an employee alleges a claim for retaliation under FMLA, the employer's intent becomes relevant.  King, 166 F.3d at 891.  The court must ask whether the employer's actions resulted from "an impermissible retaliatory or discriminatory animus."  Id.  A claim of FMLA retaliation is analyzed the same way as retaliation claims under other employment statutes, such as the ADA or Title VII.  Buie v. Quad/Graphics, Inc., 366 F.3d 496, 503 (7th Cir. 2004) (citing King, 166 F.3d at 891).

In order to prove retaliation, Alexander may rely on either the direct or indirect method.  Under the direct method, Alexander may prove her case

by relying on either direct evidence or circumstantial evidence.  Buie, 366 F.3d at 503.  Direct evidence "'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'" Id. (quoting Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003)). In this case, a clear example of direct evidence would be a statement by Cingular that Alexander was being fired because of her use of FMLA leave. See Gorence v. Eagle Food Centers, Inc., 242 F.3d 759, 762 (7th Cir. 2001). Direct evidence "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." Cowan v. Glenbrook Security Services, Inc., 123 F.3d 438, 443 (7th Cir. 1997) (quoting Randle v. LaSalle Telecommunications, Inc., 876 F.2d 563, 569 (7th Cir. 1989).  However, "'[i]n appropriate but isolated comments that amount to no more than 'stray remarks' in the workplace will not do.'" Venters v. City of Delphi, 123 F.3d 956, 973 (7th Cir. 1997)(citing Randle, 876 F.2d at 569).

Circumstantial evidence, on the other hand, "'allows a jury to infer intentional discrimination by the decision-maker.'" Buie, 366 F.3d at 503 (quoting Rogers, 320 F.3d at 753).  Evidence of suspicious timing qualifies as circumstantial evidence.  Id. at 506.  However, suspicious timing alone

is not sufficient to establish a causal connection between the employee's protected activity and the adverse employment action.  <u>Id.</u>  Indeed, "a 'temporal sequence analysis is not a magical formula which results in a finding of a discriminatory cause.'"  <u>Id.</u> (quoting <u>Foster v. Arthur Andersen, LLP.</u>, 168 F.3d 1029, 1034 (7th Cir. 1999)).

Under the indirect method, Alexander must present evidence that: (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse employment action from her employer; and (4) she was treated less favorably than similarly-situated employee who did not engage in a statutorily protected activity.  <u>Stone v. City of Indianapolis</u>, 281 F.3d 640, 642 (7th Cir. 2002).   If Alexander can establish these four elements, then the burden shifts to Cingular to come forward with a legitimate, non-retaliatory reason for its adverse action.   Once Cingular presents its reason, the burden shifts to Alexander to show that Cingular's reason is pretextual.  <u>Id.</u>

Alexander claims to have direct evidence of retaliation, which would require Alexander to prove that Cingular admitted that it fired Alexander because of her use of FMLA leave.  The closest thing Alexander points to as

an admission of discriminatory intent by Cingular is (1) a statement by Burlison to Alexander during the July 19, 2004, meeting where Burlison allegedly told her, "I've talked to you before about the FMLA" and (2) the negative way in which Burlison responded whenever Alexander requested FMLA leave.  See Davis v. Con-Way Transportation Central Express, Inc., 368 F.3d 776, 783 (7th Cir. 2004); Alexander Dep. at 36.  Alexander argues that this evidence shows that Burlison considered Alexander's use of FMLA leave when deciding to report her to the Human Resources Department for a code of business conduct violation.

Alexander further argues that, because of the information Burlison provided to the Human Resources Department regarding the July 19, 2004, incident, Rasmussen and O'Connor conducted an investigation of the alleged incident.  Alexander also argues that Burlison exaggerated the time period during which Alexander and Orr were in the break room, when she reported the incident to the Human Resources Department.  Specifically, Burlison reported that Alexander and Orr were gone for approximately 20 minutes.  To support her claim, Alexander points to Orr's Affidavit and deposition testimony in which Orr testified that she and Alexander were only gone for seven and a half minutes.  Alexander contends that Burlison's

exaggeration resulted from her animus toward Alexander over her use of FMLA leave.  Even if such evidence is viewed in the light most favorable to Alexander, she has failed to present direct evidence of retaliation.

Alexander's proffered evidence that Burlison allegedly commented about Alexander's use of FMLA leave during the July 19, 2004, meeting or that Burlison allegedly reacted in a "negative fashion" regarding Alexander's use of FMLA leave does not rise to the level of an admission by Cingular that it fired Alexander because of her use of FMLA leave.  At most, Burlison's comments are stray remarks by a non-decisionmaker. "[D]erogatory comments are relevant only when attributable to the person who made the adverse employment decision."  Schreiner v. Caterpillar Inc., 250 F.3d 1096, 1099 (7th Cir. 2001); See Cianci v. Pettibone Corp., 152 F.3d 723, 727 (7th Cir. 1998); Bahl v. Royal Indem. Co., 115 F.3d 1283, 1293 (7th Cir. 1997).  "Stray workplace comments unrelated to the alleged discriminatory employment decision are not sufficient to support an inference of discrimination."  Schreiner, 250 F.3d at 1099 (internal citations omitted).  "'A decisionmaker is the person responsible for the contested decision.'"  Davis, 368 F.3d at 783 (quoting Venturelli v. ARC Cmty. Servs., Inc., 350 F.3d 592, 600 (7th Cir. 2003).  Any statement attributed to a

person who did not make the ultimate decision regarding the adverse employment action does not constitute direct evidence.  See id.  Indeed, "a decision-maker cannot act as the 'cat's paw' for another who harbors a discriminatory animus."  Schreiner, 250 F.3d at 1100.

Both Burlison's negative reaction to Alexander's use of FMLA leave and her comments regarding Alexander's use of FMLA leave during the July 19, 2004, meeting, reveal nothing about the actual decisionmakers', including Holt, Rasmussen, and O'Connor's, motivations underlying the decision to terminate Alexander's employment; therefore, such evidence cannot constitute direct evidence.  See Davis, 368 F.3d at 783.  Indeed, there is no evidence: (1) that Burlison's purported comments were ever considered by the decisionmakers in terminating Alexander, (2) that such comments were the motivation for the decisionmakers' actions, or (3) that the actual decisionmakers were even aware of these comments.  See Schreiner, 250 F.3d at 1100.

Moreover, the undisputed evidence shows that Burlison had no actual authority to terminate Alexander.  The Seventh Circuit has held that a manager's allegedly discriminatory comments did not constitute direct evidence because the manager had no actual hiring authority, but only had

input on hiring decisions.  <u>Rogers v. City of Chicago</u>, 320 F.3d 748, 754 (7th Cir. 2003).   In this case, Burlison reported the incident to the Human Resources Department after Roberts told her that Holt may have witnessed Alexander and Orr logging into the phone system but then going to the break room without logging out, and remaining in the break room for at least 10 to 12 minutes.  Burlison's failure to report the incident might well have cost her her job, especially because the matter was referred to her by a senior manager.  When reporting the incident to the Human Resources Department, Burlison characterized the incident as a violation of the code of business conduct.

The undisputed evidence further reveals that Alexander's act could have only been characterized as a code of business conduct violation. Burlison had advised the Paperwork Department employees, including Alexander, during several coaching sessions that the act of logging into the phone system but not actually working would constitute a violation of Cingular's code of business conduct.  Alexander was fully aware that she needed to be working when logged into the phone system.  Accordingly, Alexander has failed to "demonstrate a more precise factual basis for the contention" that Burlison's views of Alexander's use of FMLA leave "were

the operative factor in the decision made by" appropriate authorities.  <u>See</u> <u>Schreiner</u>, 250 F.3d at 1100.

Furthermore, Burlison drafted separation proposals for Orr and Alexander because she was told to do so by Holt.  Holt reviewed the separation proposals and forwarded the proposals to the appropriate decisionmakers.  The undisputed evidence shows that, after being advised of the incident, Rasmussen and O'Connor conducted their independent investigation and thereafter concluded that Alexander and Orr had violated Cingular's code of business conduct.  In doing so, Rasmussen and O'Connor interviewed Orr and Alexander, who conceded that they were in the break room while logged into the phone system.

The undisputed facts show that Rasmussen and O'Connor then discussed the matter with Holt.  All three of them agreed in the decision to recommend Orr and Alexander's termination.  The undisputed facts show that the actual decisionmakers never consulted Burlison regarding their decision to terminate Alexander.

Alexander's argument that Burlison exaggerated the time period during which Alexander remained in the break room while logged into the phone system when Burlison reported the July 19, 2004, as evidence that

30

Burlison harbored a discriminatory animus, is without merit.  As explained earlier, the undisputed facts show that the decision to recommend Alexander's termination was made by Holt, Rasmussen, and O'Connor, following a separate investigation of the incident by Rasmussen and O'Connor.  Burlison was never involved in this process.

Alexander also argues that Holt's decision to terminate Alexander was influenced by her review of Alexander's interaction log, which detailed her use of FMLA leave, on July 19, 2004.  Even if Holt knew of Alexander's use of FMLA leave, there is no evidence in the record suggesting that the decisionmakers, including Holt, considered Alexander's use of FMLA leave when making their decisions.  Thus, for the same reasons stated above, this argument fails.

The Court also finds that Alexander has failed to present any circumstantial evidence of retaliation.  Alexander points to the sequence of events, arguing that the timing supports an inference of retaliation.  The last time Alexander exercised her right to use FMLA leave was on July 3, 2004.  Alexander Dep. at 67.  She was terminated from her job on August 2, 2004, because of the July 19, 2004, incident.  There is almost a one-month interval between the protected activity and the adverse employment action.

31

"This attenuated sequence of events, . . . , without more, is insufficient" to establish a causal link between the protected activity and the adverse action. <u>Lewis v. Holsum of Fort Wayne, Inc.,</u> 278 F.3d 706, 711 (7th Cir. 2002). Moreover, even if the timing of the events is suspicious, temporal proximity alone would not create an issue of material fact as to causation. <u>Buie</u>, 366 F.3d at 506. Indeed, Alexander must show that her use of FMLA leave was tied to her termination. In this effort, Alexander points to Burlison's alleged comment about Alexander's use of FMLA leave during the meeting held July 19, 2004, as well as Burlison's alleged tendency to react in a "negative fashion" regarding Alexander's use of FMLA leave. However, for the same reasons stated above, these acts are not sufficient to establish that Cingular fired Alexander for her use of FMLA leave. The undisputed evidence shows that Burlison was not directly involved in the decision to terminate Alexander; the undisputed evidence shows that none of the decisionmakers, including Holt, Rasmussen, and O'Connor, ever considered Alexander's use of FMLA leave as the basis for their decision to terminate her employment. Accordingly, Alexander has failed to present circumstantial evidence of retaliation.

Alexander has also failed to establish a <u>prima facie</u> case of retaliation

under the indirect method.  Alexander has presented sufficient evidence to establish two elements of a <u>prima</u> <u>facie</u> case.  She engaged in protected activity by taking FMLA leave, and she suffered an adverse employment action when she was terminated from her job.  However, Alexander has failed to present sufficient evidence to establish that she was meeting Cingular's reasonable expectations.  Indeed, Alexander concedes that she was not meeting Cingular's reasonable expectations.

Alexander, however, argues that even if she failed to meet Cingular's reasonable expectations at the time of her termination, she can still make out a <u>prima</u> <u>facie</u> case for retaliation because Cingular applied its legitimate employment expectations in a disparate manner.  See <u>Peele v. Country Mutual Insurance Co.,</u> 288 F.3d 319, 329 (7<u>th</u> Cir. 2002).  The Seventh Circuit has stated that "[w]hen a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner (i.e., applied expectations to similarly situated . . . employees in a more favorable manner), the second and fourth prongs of <u>McDonnell Douglas</u> merge -- allowing the plaintiff to establish a <u>prima</u> <u>facie</u> case, stave off summary judgment for the time being, and proceed to the pretext inquiry."  <u>Peele</u>, 288 F.3d at 329; <u>See</u> <u>e.g</u>, <u>Curry v.</u>

Menard, 270 F.3d 473, 478 (7th Cir. 2001); Gordon v. United Airlines, Inc.,

246 F.3d 878, 886-87 (7th Cir. 2001); Oest v. Illinois Dept. of Corr., 240

F.3d 605, 612 n. 3 (7th Cir. 2001); Flores v. Preferred Tech. Group, 182

F.3d 512, 515 (7th Cir. 1999).

In this effort, Alexander not only refers to her deposition testimony

but also Orr's Affidavit in which they both stated that other clerks in the

Paperwork Department were allowed to leave their work stations to engage

in non-work related activities, such as purchasing food from the cafeteria,

eating food at their desks or in the break room, taking smoke breaks, and

going to the bathroom, while logged into the phone system.  For purposes

of this Motion, the Court will not consider such statements.  As indicated

earlier, the statements contained in Orr's Affidavit are stricken because they

fail to set forth a sufficient factual basis for Orr's knowledge that these

employees were "logged into the phone system" while engaging in non-work

related activities, as required under Fed.R.Civ.P. 56(e).

Likewise, Alexander's testimony at her deposition in which she stated

that she witnessed these employees engaging in non-work related activities

while "on the clock" will not be considered by the Court. Even though

Alexander could have witnessed these employees eating meals at their work

stations, going to the cafeteria, or taking breaks, she fails to sufficiently set forth how she knew these employees were "logged" into the phone system and "on the clock" while engaging in the aforementioned activities, as specifically required under Fed.R.Civ.P. 56(e).  The Court concludes that these statements are therefore merely speculation and insufficient to preclude summary judgment.

Finally, the only remaining individual that was similarly situated to Alexander is Orr.  The evidence, however, suggests that Orr is a similarly situated individual who did not engage in a protected activity but was treated the same way as Plaintiff in that Orr was also terminated for the July 19, 2004, incident.  It is undisputed that Orr last took FMLA leave two years prior to her termination.  After her transfer to the Paperwork Department, she never applied for leave under FMLA.  Thus, Alexander fails to identify a similarly situated individual who did not engage in a protected activity who was treated more favorably.  Indeed, the undisputed evidence shows that the similarly situated employee who did not engage in a protected activity was treated identically to Alexander.  Plaintiff has failed to establish a prima facie case of retaliatory discharge.  Cingular is entitled to summary judgment.

THEREFORE, Defendant's Motion to Strike Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (d/e 28) is DENIED; Defendant's Motion to Strike Portions of the Affidavit of Sabrina Orr (d/e 29) is ALLOWED, in part, and DENIED, in part; and Defendant's Motion for Summary Judgment (d/e 25) is ALLOWED. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   March 8, 2006.

FOR THE COURT:

_____ s/ Jeanne E. Scott _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE